CANDY TREJO,

          Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social
Security,

          Defendant.

) Case No. EDCV 17-0879-JPR
)
)
) **MEMORANDUM DECISION AND ORDER**
) **REVERSING COMMISSIONER**
)
)
)
)
)
)
)

## I.  PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying her applications for Social Security disability insurance benefits ("DIB") and supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed December 28, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is reversed and this action is remanded for further proceedings.

## II.  BACKGROUND

Plaintiff was born in 1965.  (Administrative Record ("AR") 67, 224.)  She received a high school diploma (AR 38, 252) and worked as a portrait finisher (AR 59, 252).

On December 7, 2012, and February 19, 2013, Plaintiff applied for SSI and DIB, respectively, alleging that she had been unable to work since September 1, 2008,[1] because of attention deficit disorder, major depressive disorder, fibromyalgia, sleep apnea, and osteoarthritis.  (AR 67-68, 80-81, 224-30, 251.)  After her applications were denied initially and on reconsideration (see AR 93-94, 125-26, 129, 136), she requested a hearing before an Administrative Law Judge (AR 142).  A hearing was held on August 7, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 33-66, 223.)  In a written decision issued September 22, 2015, the ALJ found Plaintiff not disabled.  (AR 14-32.)  Plaintiff sought Appeals Council review (AR 8-9), which was denied on March 7, 2017 (AR 1-6).  This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial

---

[1] Plaintiff listed September 1, 2008, as her disability-onset date.  (AR 224, 226.)  In all other paperwork, however, including the ALJ's decision, June 15, 2006, is listed as her onset date.  (AR 14, 67-68, 80-81, 251.)

evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

## IV. THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A. The Five-Step Evaluation Process

The ALJ follows a five-step evaluation process to assess whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is

not disabled and the claim must be denied. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful
activity, the second step requires the Commissioner to determine
whether the claimant has a "severe" impairment or combination of
impairments significantly limiting her ability to do basic work
activities; if not, the claimant is not disabled and her claim
must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments set
forth at 20 C.F.R. part 404, subpart P, appendix 1; if so,
disability is conclusively presumed. §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments
does not meet or equal an impairment in the Listing, the fourth
step requires the Commissioner to determine whether the claimant
has sufficient residual functional capacity ("RFC")[2] to perform
her past work; if so, she is not disabled and the claim must be
denied. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant
has the burden of proving she is unable to perform past relevant
work. Drouin, 966 F.2d at 1257. If the claimant meets that
burden, a prima facie case of disability is established. Id. If

_____

[2] RFC is what a claimant can do despite existing exertional
and nonexertional limitations. §§ 404.1545, 416.945; see Cooper
v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The
Commissioner assesses the claimant's RFC between steps three and
four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017)
(citing § 416.920(a)(4)).

that happens or if the claimant has no past relevant work, the
Commissioner then bears the burden of establishing that the
claimant is not disabled because she can perform other
substantial gainful work available in the national economy.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v); Drouin, 966 F.2d at 1257.
That determination comprises the fifth and final step in the
sequential analysis. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v);
Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.    The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since June 15, 2006. (AR 16.) At
step two, she concluded that Plaintiff had severe impairments of
"history of fibromyalgia; obstructive sleep apnea;
osteoarthritis; degenerative disc disease of the cervical spine;
obesity; chronic pain syndrome; mild to moderate degenerative
joint disease of the right shoulder, status-post surgery; major
depressive disorder; attention deficit disorder/attention deficit
hyperactivity disorder; and anxiety." (AR 16-17.) At step
three, she determined that Plaintiff's impairments did not meet
or equal a listing. (AR 17.) At step four, the ALJ found that
Plaintiff had the RFC to perform a limited range of light work:

> Standing, walking, and sitting would all be consistent
> with light work but [she] would need to alternate
> position approximately every 30-45 minutes, the change in
> position would be about 1-5 minutes, and she would be
> able to remain on task during that time. [She] is
> limited to occasional postural activities but no climbing
> of ladders, ropes, or scaffolds and no work at

unprotected heights, around moving machinery, or other hazards. She can occasionally reach overhead with the dominant right upper extremity but no lifting overhead with the right dominant upper extremity. The non-dominant left hand should be limited to frequent fine manipulation and there should be no repetitive push or pull with the right lower extremity such as operating foot petals [sic]. She must avoid concentrated exposure to fumes, odors, gases, or other pulmonary irritants as well as extreme temperatures and avoid frequently walking on uneven terrain. [She] is limited to no fast paced production or assembly line type work. She can concentrate for up to 2 hours at a time but is limited to unskilled simple tasks with occasional non-intense interaction with the general public.

(AR 19-20.) Based on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform her past relevant work. (AR 26-27.) At step five, the ALJ found that given Plaintiff's age, education, work experience, and RFC, she could perform three "representative" jobs in the national economy. (AR 27-28.) Thus, the ALJ found Plaintiff not disabled. (AR 28.)

**V. DISCUSSION**[3]

    A.   <u>The ALJ Erred in Discounting Plaintiff's Subjective</u>
        <u>Symptoms</u>

    Plaintiff argues that the ALJ improperly rejected her subjective symptom statements. (J. Stip. at 5-12, 20-21.) As discussed below, the ALJ materially erred in discounting her statements' credibility. Accordingly, remand is warranted.

    1.   <u>Applicable law</u>

    An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." <u>See</u> <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)).

    In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. <u>See</u> <u>Lingenfelter</u>, 504 F.3d

---

[3] In <u>Lucia v. SEC</u>, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause. To the extent <u>Lucia</u> applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings. (<u>See</u> AR 8-9, 33-66, 335-37; J. Stip. at 5-12, 20-21); <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council).

at 1035-36; see also SSR 96-7p, 1996 WL 374186 (July 2, 1996).[4]

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir.

---

[4] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 16, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however, and therefore does not apply. Still, the Ninth Circuit has clarified:

> [SSR 16-3p] makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to "evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.

Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

2015) (as amended); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775

F.3d 1090, 1102 (9th Cir. 2014). In assessing credibility, the

ALJ may consider, among other factors, (1) ordinary techniques of

credibility evaluation, such as the claimant's reputation for

lying, prior inconsistent statements, and other testimony by the

claimant that appears less than candid; (2) unexplained or

inadequately explained failure to seek treatment or to follow a

prescribed course of treatment; (3) the claimant's daily

activities; (4) the claimant's work record; and (5) testimony

from physicians and third parties. <u>Rounds v. Comm'r Soc. Sec.

Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas

v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's

credibility finding is supported by substantial evidence in the

record, the reviewing court "may not engage in second-guessing."

<u>Thomas</u>, 278 F.3d at 959.

    2. <u>Relevant background</u>

        i. *Treatment Records*[5]

Plaintiff began seeing internist Rick Tang in November

2006.[6] (AR 530.) Dr. Tang observed that she "had multiple

---

[5] Plaintiff consistently received primary-care treatment at Riverside Medical Clinic, but she saw several different doctors there. (<u>See, e.g.</u>, AR 512-15 (family physician Steven A. Salzman), 517-18 (internist Rick Tang), 533-34 (gastroenterologist Philip T. Chen), 557-58 (pulmonologist Andrew T. Duke).)

[6] At Plaintiff's first appointment with Dr. Tang, she reported that she "ha[d] been under the care of Dr. Steven Myering," who had "done [an] EMG which . . . show[ed] neuropathy." (AR 530.) She also claimed to have been given a "course of injections" for her pain. (<u>Id.</u>) No such treatment notes, imaging, or injections from before November 2006 appear in the record, however.

trigger points on [her] neck, shoulders, hips, and elbows."

(Id.) He assessed her with "[c]hronic pain syndrome,"

"[f]ibromyalgia with multiple trigger points," "[a]nxiety/

depression," and "[q]uestionable neuropathy with pain in both

arms"; he prescribed amitriptyline[7] and Prozac.[8] (AR 532.) In

February 2007, Plaintiff "complain[ed] of increasing [and] achy

body pain everywhere," and Dr. Tang wrote that it was "unclear"

whether Plaintiff's "[d]iffuse body ache[s]" were "fibromyalgia

versus undiagnosed inflamma[to]ry arthritis." (AR 525.) He

advised taking ibuprofen, prescribed Zantac[9] and temazepam,[10] and

referred her to rheumatologist Andre Babajanians to obtain

further information on her chronic pain. (Id.) Dr. Babajanians

found that Plaintiff had "[m]ultiple symmetric tender points" in

her musculoskeletal soft tissue at "16 out of 18 defined areas."

(AR 524.) He requested an x-ray of her cervical spine (id.),

which showed "[m]inimal degenerative disk disease at C5-6," with

---

[7] Amitriptyline treats depression by improving mood, relieving anxiety, helping patients sleep better, and increasing energy levels. See Amitriptyline HCL, WebMD, https://www.webmd.com/drugs/2/drug-8611/amitriptyline-oral/details (last visited July 23, 2018).

[8] Prozac treats depression by improving mood, sleep, appetite, and energy level. See Prozac, WebMD, https://www.webmd.com/drugs/2/drug-6997/prozac-oral/details (last visited July 23, 2018).

[9] Zantac treats stomach and intestine ulcers. See Zantac Tablet, WebMD, https://www.webmd.com/drugs/2/drug-4090-7033/zantac-oral/ranitidine-tablet-oral/details (last visited July 23, 2018).

[10] Temazepam treats insomnia by helping patients fall asleep faster, stay asleep longer, and decrease how often they wake up during the night. See Temazepam, WebMD, https://www.webmd.com/drugs/2/drug-8715/temazepam-oral/details (last visited July 23, 2018).

10

"very minimal anterior osteophytes," and was otherwise "normal" (AR 493).  He diagnosed "[c]hronic generalized fatigue, myalgia, [and] lack of evidence for inflammatory process, consistent with fibromyalgia"; "[c]ervical spondylosis"; and "early osteoarthritis."  (AR 524.)  He advised her to continue Motrin and temazepam and to try "50 mg" of Lyrica[11] "for further pain control."  (Id.)

In April 2007, Plaintiff reported no "overall improvement" in her "generalized aches and pains [and] stiffness," and Dr. Babajanians diagnosed "[f]ibromyalgia syndrome."  (AR 522.)  She was taking Prozac and amitriptyline, and he also prescribed Neurontin.[12]  (Id.)  In May 2007, Plaintiff reported "increased anxiety and depression" and complained of "fatigue and daytime somnolence."  (AR 521.)  She exhibited "[m]ultiple aches and pain[s]" upon palpation of her "neck, shoulder, elbows[,] and hip."  (Id.)  Dr. Tang noted that her chronic fatigue "may be . . . related to sleep apnea" and ordered a sleep study.  (Id.; see also AR 474.)  He wrote that her "[d]iffuse[] muscle aches

---

[11] Lyrica treats fibromyalgia pain.  See Lyrica, WebMD, https://www.webmd.com/drugs/2/drug-93965/lyrica-oral/details (last visited July 23, 2018).

[12] Neurontin relieves nerve pain and prevents and controls seizures.  See Neurontin Capsule, WebMD, https://www.webmd.com/drugs/2/drug-9845-8217/neurontin-oral/gabapentin-oral/details (last visited July 23, 2018).

may be fibromyalgia" and prescribed Cymbalta[13] and Tagamet[14] on top of her other prescriptions. (AR 521.) The sleep study was performed in June 2007 and revealed that Plaintiff had "[m]oderate obstructive sleep apnea/hypopnea" and was "a good candidate for ongoing treatment with CPAP." (AR 457-59.) In August 2007, it was noted that she "could not tolerate [the] standard CPAP mask" (AR 471); Dr. Tang adjusted her prescription to a "nasal pillow[] mirage swift" CPAP mask (AR 472-73).

In October 2007, Plaintiff complained to Dr. Babajanians of "severe generalized pain" and "difficulty moving." (AR 519.) In November 2007, she reported to Dr. Tang that she had "diffuse muscle spasm[s] of both legs to the point that she could not walk," and he found "diffuse pain on palpating [her] neck, upper trapezius, elbows, hips, back, and legs." (AR 518.) He prescribed Vicodin[15] "three times a day [on an] as needed basis for severe pain." (Id.) He also increased her Neurontin, added Robaxin[16] "as needed for muscle spasm," and "change[d] her over"

---

[13] Cymbalta helps relieve ongoing pain from fibromyalgia. See Cymbalta, WebMD, https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited July 23, 2018). It also treats depression and anxiety. See id.

[14] Tagamet treats stomach and intestine ulcers and prevents them from returning once they have healed. See Tagamet Tablet, WebMD, https://www.webmd.com/drugs/2/drug-7035/tagamet-oral/details (last visited July 23, 2018).

[15] Vicodin is a narcotic pain reliever used to relieve moderate to severe pain. See Vicodin, WebMD, https://www.webmd.com/drugs/2/drug-3459/vicodin-oral/details (last visited July 23, 2018).

[16] Robaxin treats muscle spasms and pain. See Robaxin, WebMD, https://www.webmd.com/drugs/2/drug-11197/robaxin-oral/details (last visited July 23, 2018).

from Prozac to Celexa.[17]  (Id.)  In December 2007, she "ha[d]
slight improve[ment] but continue[d] to have lots of aches and
pains."  (AR 517.)  She was "wobbly," had a "lot of difficulty
with balance issues," and "walk[ed] with a cane."  (Id.)  She had
"diffuse pain everywhere" upon palpation, but Dr. Tang did not
see any "peripheral shaking or tremor."  (Id.)  He increased her
Neurontin, continued Vicodin, Celexa, and Robaxin, and referred
her to neurologist Ronald Bailey to address her "ambulatory
dysfunctions and loss of balance and shaking on the left side."[18]
(Id.)

In May 2008, Dr. Tang wrote that "[i]nitially Lyrica [had]
helped [her] pain but [they] need[ed] to keep upping her [dosage]
as her pain ke[pt] on worsening."  (AR 516.)  He assessed her
with "[i]ncreasing" depression, anxiety, and diffuse pain; he
also noted that her foot pain affected her ambulation.  (Id.)
Her Lyrica prescription was increased from "150 mg" to "300 mg"

---

[17] Celexa treats depression.  See Celexa, WebMD, https://
www.webmd.com/drugs/2/drug-8603/celexa-oral/details (last visited
July 23, 2018).

[18] Dr. Bailey saw Plaintiff for an initial neurologic
consultation in January 2008.  (See AR 541-43.)  "Coordination
testing reveal[ed] normal finger-to-nose-to-finger testing";
motor examination "demonstrate[d] normal bulk, tone, and strength
throughout"; reflex testing "reveal[ed] flexor plantar responses
bilaterally, 1-2+ and symmetric throughout"; and sensory
examination was "normal."  (AR 542.)  Dr. Bailey's "impression"
was "[a]ches, pains, and cramps syndrome."  (Id.)  At a follow-up
appointment in March 2008, Plaintiff demonstrated "completely
normal bulk, tone, and strength in all muscle groups" and had "1-
2+ and symmetric reflexes throughout"; "[s]ensory examination
[was] normal."  (AR 535.)  Dr. Bailey performed a nerve-
conduction study that same day, with "[n]ormal" results; there
was "no electrophysiologic evidence to support a primary disorder
of nerve or muscle."  (AR 536.)  He prescribed "75 mg" of Lyrica
twice a day.  (AR 535.)

twice a day "for better pain control." (Id.)

In October and November 2009, she had "pain in both her upper and lower body," "multiple trigger points," "abdominal pain," and depression.[19] (See AR 510, 512, 514.) She had sleep apnea but hadn't used her CPAP machine in two years. (AR 512, 514, 557.) Her "[s]ensory and motor [nerves were] grossly intact," and her deep tendon reflexes were "within normal limits." (AR 513-14.) She also had "epigastric pain." (AR 510, 512.) Lyrica was increased to "350 mg" twice a day and Vicodin was continued. (AR 510, 512, 514.)

Dr. Babajanians saw her for a rheumatology consult in November 2009. (See AR 508-09.) He observed "[m]ultiple tender points" in her upper and lower back, chest wall, neck, and knees, totaling "12/18 defined points." (AR 508.) She had "[n]o synovial swelling" in her peripheral joints but had "[s]light discomfort with full abduction of [her] arms and shoulders [and] limitation in [her] lumbar flexion." (Id.) He noted that her Lyrica had been increased to "700 mg per day" and "hepatic enzymes [were] mildly elevated"; though her fibromyalgia showed "symptomatic improvement," she had "[m]ild hepatitis, likely associated with [her] medications." (AR 508-09.) He advised "[d]ecreas[ing] [her] dose of Lyrica gradually" to a "maximum dose [of] 450 mg per day" and "[m]onitor[ing] [her] liver function tests." (AR 509.)

In December 2009, she had a cardiovascular consult with cardiologist Houshang Karimi to address "atypical chest pain."

_____

[19] No treatment notes appear in the record from between May 2008 and October 2009.

14

(See AR 560-62.) Dr. Karimi wrote that Plaintiff had taken a treadmill stress test in November, which was "nondiagnostic" because she did not reach target heart rate. (AR 560-61; see also AR 467-69.) He observed that she was "in no apparent distress," and her sensation and muscle strength were "intact." (AR 560.) He recommended an "echo to evaluate the overall [left ventricle] function and right heart pressures given her [history] of [obstructive sleep apnea] and being short of breath chronically." (AR 561.)

In July 2010, Plaintiff's depression was "doing relatively well." (AR 506.) Lyrica had been "helpful" for her fibromyalgia, though she complained of "aching pain" in her lower back. (Id.) The pain "d[id] not radiate through the buttocks or down the legs," but it got worse "with prolonged walking" and "when going from . . . sitting or lying to a standing position." (Id.) Family physician Steven A. Salzman observed that she had "good range of motion in [her] back," with "no paraspinous spasm." (AR 507.) She had "no tenderness on palpation of the lumbar sacral spine" or "over the sciatic notch." (Id.) Her deep tendon reflexes were "within normal limits," and her straight-leg raise was "negative." (Id.) He "[r]enew[ed]" her Lyrica at "150" mg twice a day and also prescribed Naprosyn.[20] (AR 506-07.)

In October 2010, she had a rheumatology follow-up with Dr.

---

[20] Naprosyn is a nonsteroidal antiinflammatory that relieves pain from muscle aches and reduces pain, swelling, and joint stiffness caused by arthritis. See Naprosyn Tablet, WebMD, https://www.webmd.com/drugs/2/drug-1705-1289/naprosyn-oral/naproxen-oral/details (last visited July 23, 2018).

Babajanians. (AR 505.) She reported that she "continue[d] to feel relatively well, more lucid, [and] able to concentrate on tasks better" on Lyrica. (Id.) Her "main problem" was "mid abdominal discomfort" that "extend[ed] to the mid back region" and "increas[ed] in intensity after eating." (Id.) Dr. Babajanians observed "tender points in [her] upper and lower back and chest" at "6/18 defined areas" and "normal and symmetric" muscle strength. (Id.) He noted that her fibromyalgia was "symptomatically stable" and "[c]ontinue[d] Lyrica." (Id.)

In February 2011, Plaintiff went to urgent care complaining of mid- and low-back pain. (AR 476.) In April 2011, she had a "sore throat" and other related symptoms, but her "[o]ther pains [were] relatively controlled on [L]yrica and naproxen."[21] (AR 497.) In May 2011, she felt an "achy sensation all over" but was "slightly better since [being] on Lyrica." (AR 496.) Dr. Babajanians observed that she had "persistent soft tissue tender points" on her back and chest wall and "normal and symmetric" muscle strength. (Id.) In July 2011, she reported that her back pain "flare[d] up with walking." (AR 494.) In August 2011, she went to urgent care, reporting "moderate," "intermittent[]" chest pain in the "substernal region" "at a severity of 7/10." (AR 429.) The "sharp" pain "radiate[d] to [her] mid back," causing abdominal pain, back pain, and nausea. (Id.) She exhibited "tenderness" in her abdomen and on her "anterior left chest wall." (AR 430.) Her physical exam was "[n]egative for

---

[21] Naproxen is a generic version of Naprosyn. See Naproxen Tablet, WebMD, https://www.webmd.com/drugs/2/drug-5173-1289/naproxen-oral/naproxen-oral/details (last visited July 23, 2018).

myalgias," "dizziness, tingling, tremors and headaches" (id.),
and an "unremarkable" chest x-ray showed "[n]o definite acute
abnormality" (AR 449-50). She was advised to take ibuprofen for
her pain and received one ketorolac injection.[22] (AR 431.) In
October 2011, she had no abdominal tenderness or chest pain. (AR
421.) Plaintiff reported that though she "ha[d] some baseline
levels of pain," she was "[f]eeling well" and "fe[lt] able to do
most of her desired activity." (Id.) She stated that
"motivation or laziness ha[d] made it tough to continue
exercising as much as she'd like." (Id.)

In November 2011, Plaintiff complained of a "slight increase
in intensity of generalized fatigue and myalgia" because of her
sleep apnea. (AR 414.) She was "involved in exercises" and
stated that "Lyrica remain[ed] effective." (Id.) Dr.
Babajanians wrote that she was "[p]ositive for myalgias and joint
pain," exhibited musculoskeletal "tenderness," and had "[m]ild
diffuse soft tissue tenderness including 12/18 defined tender
points." (AR 415.) He prescribed a trial of nortriptyline.[23]
(Id.)

In March 2012, she stated that she had a headache, though
she did not get them "routinely." (AR 405.) She had right-knee
tenderness, with a "[n]ormal" musculoskeletal range of motion (AR
406), and was positive for "malaise/fatigue" and myalgias (AR

---

[22] Ketorolac is a nonsteroidal antiinflammatory used to
relieve moderate to severe pain. See Ketorolac Tromethamine
Syringe, WebMD, https://www.webmd.com/drugs/2/drug-6419/
ketorolac-injection/details (last visited July 23, 2018).

[23] Nortriptyline treats depression. See Nortriptyline HCL,
WebMD, https://www.webmd.com/drugs/2/drug-10710/
nortriptyline-oral/details (last visited July 23, 2018).

17

398).  That same month, she began receiving mental-health treatment from psychologist Ronald Offenstein to address her grief after the passing of her father-in-law.  (AR 361, 405; <u>see also</u> AR 352-54 (initial clinical assessment completed by nurse practitioner).)  She did not have orientation, cognitive, or memory impairment but had "[m]oderate[ly]" poor concentration and "[s]evere[ly]" decreased energy.  (AR 361.)  Dr. Offenstein wrote that she was "motivated" but had "poor insight" (AR 362); she had "average" intelligence, was "distractible," and had "intact" judgment and memory (AR 363).  She had "[s]evere" impairments in holding an occupation and accomplishing personal-care and daily-living activities.  (<u>Id.</u>)

In April 2012, she told Dr. Offenstein that she "believe[d] she need[ed] to get a job" but that "nobody would hire her" because she couldn't "read, write, [or] spell."  (AR 358.)  She stated that she "didn't finish school" but "went to adult school."  (<u>Id.</u>)  She did not have any orientation, cognitive, or memory impairment but had "[s]evere[ly]" poor concentration.  (<u>Id.</u>)  She was prescribed "25 mg" of Topamax[24] twice a day.  (AR 351.)  In May 2012, he did not indicate that she had any mental-impairment symptoms (AR 357), but that same month, Kathleen Kelly, a licensed clinical social worker, wrote that Plaintiff had "cognitive impairment" and "[m]oderate[ly]" poor concentration (AR 356).  She had "[m]oderate" problems with her

---

[24] Topamax prevents migraine headaches and seizures.  <u>See Topamax</u>, WebMD, https://www.webmd.com/drugs/2/drug-14494-6019/ topamax-oral/topiramate-oral/details (last visited July 23, 2018).

personal care.  (Id.)  She was prescribed "50 mg" of Zoloft,[25] to
be increased to "100 mg" after a week.  (AR 349.)  That
prescription was increased to "150 mg" in June 2012.  (AR 348.)

The same month, Plaintiff complained of "pain all over,"
specifically describing "knee pain."  (AR 390-91.)  She mentioned
completing "extensive workouts" to lose weight, though they
caused "some pain."  (AR 390.)  Gastroenterologist Philip T. Chen
prescribed a trial of tramadol[26] "for pain" and to address
Plaintiff's complaints that "[V]icodin on rare occasion [was] too
strong."  (AR 390-91.)  In August 2012, she was reevaluated for
sleep apnea.  (AR 382.)  She had been "unable to tolerate" the
CPAP mask (AR 382-33), so another was ordered for her (AR 461-
62).  In October 2012, however, she still "struggle[d] with each
mask" (AR 376); another was ordered (AR 463-65).  That same
month, she attended a follow-up appointment with Dr. Babajanians,
complaining of "generalized soft tissue pain, arthralgia,
stiffness, [and] fatigue."  (AR 366.)  She stated that her
medications were "inadequate in controlling [the] intensity of
[her] pain."  (Id.)  Dr. Babajanians observed that she
"exhibit[ed] tenderness" and "[m]ultiple symmetric soft tissue

---

[25] Zoloft treats depression, panic attacks, and social
anxiety disorder, among other uses.  See Zoloft, WebMD, https://
www.webmd.com/drugs/2/drug-35-8095/zoloft-oral/sertraline-oral/
details (last visited July 23, 2018).

[26] Tramadol is a narcotic used to relieve moderate to
moderately severe pain.  See Tramadol HCL, WebMD, https://
www.webmd.com/drugs/2/drug-4398-5239/tramadol-oral/tramadol-oral/
details (last visited July 23, 2018).

tender points, early Heberden nodes[,][27] [and] [m]ild crepitus in [her] shoulders and knees." (AR 367.)  Vicodin and tramadol were discontinued (see AR 367, 384), and Dr. Babajanians prescribed a "Butrans patch,"[28] to be used once a week (AR 367).

In January 2013, she reported "generalized" "pain all over [her] body." (AR 625.)  X-rays of her feet revealed "calcaneal spur[s]"; the spur on her left foot was "moderately large" but on her right it was "[s]mall," and the imaging was "otherwise unremarkable." (AR 601-02.)  X-rays of both hands were "[u]nremarkable" (AR 603), and a pelvic x-ray showed "no evidence" to "suggest rheumatoid arthritis" (AR 604).  Imaging of Plaintiff's "mid and upper cervical spine" was similarly "[u]nremarkable." (AR 605.)  Her lumbosacral spine showed "no evidence of bone erosion to suggest rheumatoid arthritis" (AR 606) but had "grade 1 retrolisthesis of L5 on S1" (AR 605).  Imaging of her thoracic spine was "[e]ssentially normal." (AR 606-07.)

In February 2013, she was noted as having "18/18 tender points." (AR 624.)  In May 2013, Plaintiff sought emergency care for back pain, though she was "able to ambulate." (AR 588-89.)  In June 2013, she complained of sternal pain and a tight chest. (AR 579, 584.)  A few days later, she was assessed at the

---

[27] Heberden's nodes are bony swellings that form on the hands as a result of osteoarthritis.  See What Are Heberden's Nodes?, Healthline, https://www.healthline.com/health/osteoarthritis/heberdens-nodes (last updated May 9, 2017).

[28] A Butrans patch contains a narcotic used to relieve severe ongoing pain.  See Butrans Patch, Transdermal Weekly, WebMD, https://www.webmd.com/drugs/2/drug-155153/butrans-transdermal/details (last visited July 23, 2018).

emergency department with "[a]typical [chest pain]." (AR 580.)
A chest x-ray that month showed "[n]o acute disease." (AR 600.)
In September 2013, Plaintiff complained of left-finger and -thumb
pain that occurred "after trying to pull a handle with a lot [of]
effort." (AR 612.) X-rays of her left hand and thumb were
ordered (AR 612-13); her left hand was "normal," with "intact"
soft tissues (AR 627), and her left thumb had "no fractures,
subluxations, foreign bodies or bony destructive processes" (AR
628). She received steroid injections in each finger, and the
"pain released after [the] injection[s]." (AR 611.) In November
2013, she reported that her right shoulder was injured when a
"large dog yanked [on the] leash" (AR 649), but an x-ray of the
shoulder was "normal" (AR 664).

In January 2014, Plaintiff was seen for her chronic shoulder
pain, and an MRI was ordered. (AR 643.) The MRI revealed
"[m]ild-to-moderate supraspinatus," "mild infraspinatus,"
"subscapularis tendinosis," and "[m]ild-to-moderate degenerative
changes at the acromioclavicular joint"; "[n]o high-grade partial
or full-thickness rotator cuff tendon tear, tendon retraction or
muscle atrophy" was found. (AR 652-53.) In March 2014, she
underwent an overnight sleep study that confirmed she had "[m]ild
overall [o]bstructive [s]leep [a]pnea," with "[s]evere REM
related obstructive apneas/hypopneas." (AR 656-57.) When using
a CPAP machine calibrated to a pressure of 10 cm, however, the
"apneas/hypopneas and snoring were eliminated, including during
REM sleep while on [her] back." (AR 656.) In April 2014, she
was referred to "ortho" to address "shoulder tenderness" from her
"right rotator cuff impingement." (AR 641, 817.) Orthopedic

surgeon Raja Dhalla ordered "shoulder arthroscopy with
subacromial decompression" (AR 744), which he performed on May
20, 2014 (AR 720-22, 733-34, 742).  He also ordered an ECG prior
to her surgery; the results were "[a]bnormal" when "compared"
with a 2009 ECG.  (AR 769-70.)  Dr. Dhalla performed an
"[a]rthroscopic repair" of the tear and "debridement of [the]
labrum and synovitis."  (AR 766.)  Postsurgery, he diagnosed
Plaintiff with "[r]ight shoulder rotator cuff impingement
syndrome" and observed "findings of synovitis" and a "superior
labrum tear."  (Id.)  She was discharged from the hospital that
same day.  (AR 808.)

Also in May, Plaintiff obtained care at an arthritis clinic
for "persistent" "joint pain" in "multiple sites."  (AR 821, 824,
826.)  She reported "active depression, stress/anxiety, snor[ing]
at night, fatigue, mood swing[s], memory loss, difficulty with
concentration, dizziness, numbness/tingling, abdominal pain,
[and] constipation" but denied "interrupted sleep, severe
headache[s], crying spells, exercis[ing] regularly[,] or
diarrhea."  (Id.)  She was "encouraged to lose weight and
exercise regularly" and to "use [her] C-PAP machine on a regular
basis."  (AR 822, 825, 827.)  She was prescribed meloxicam[29] and
Flexeril[30] to treat her pain.  (AR 822.)  In September 2014, she
complained of "shortness of breath"; she was advised to continue

[29] Meloxicam is a nonsteroidal antiinflammatory that reduces
pain, swelling, and stiffness of the joints.  See Meloxicam,
WebMD, https://www.webmd.com/drugs/2/drug-911/meloxicam-oral/
details (last visited July 23, 2018).

[30] Flexeril treats muscle spasms by relaxing the muscles.
See Flexeril Tablet, WebMD, https://www.webmd.com/drugs/2/drug-
11372/flexeril-oral/details (last visited July 23, 2018).

using her CPAP machine and was referred to pulmonology. (AR 638-39.) She visited the emergency room but showed "no significant abnormalities." (AR 687, 699.) She underwent another ECG; the results were "normal" when compared with her May 2014 test. (AR 715; see also AR 699.) A chest x-ray was also "within normal limits." (AR 698, 714.) She refused to stay to "complete her evaluation," however, and was released "against medical advice." (AR 696, 710-11.)

In December 2014, Plaintiff complained of "pain in [her] legs" because she "ha[d] been walking 3 miles/day." (AR 635.) She was diagnosed with "shin splints" and advised to "ice" her legs and "rest from walking." (Id.) In January 2015, she visited a foot-and-ankle specialist for "orthotics for walking shoes" because she was "trying to stay active to lose weight." (AR 676.) She exhibited "[s]table foot posture with flattening/decreased medial arch" bilaterally, showed "[g]ood muscle strength," and had "adequate muscle tone and symmetry" bilaterally. (Id.) Her "range of motion for all joints from the ankle" was "[d]ecreased." (Id.) In February 2015, Plaintiff refilled her Lyrica prescription and reported that her "pain [was] controlled" on it; she "denie[d] any [other] complaints." (AR 633.) She was fitted for orthotics in March 2015 (AR 671), and in April she stated that they "help[ed] in [her] walking shoes" and "seem[ed] to be improving some of [her] painful symptoms" (AR 669-70). She had "no [foot] complaints at th[at] time" and noted only that she was "concerned with arthritis in [her] hands." (AR 670.)

On April 22, 2015, she reported to family physician Gita

23

Tavassoli that "several days" prior she had "passed out" while "shaking" and had "wet herself." (AR 836.) Dr. Tavassoli ordered an ECG and EEG and advised "avoid[ing] taking [her] med[ications] together." (Id.) The EEG was "normal."[31] (AR 679.) She saw neurologist Maninder S. Arora in June 2015, reporting that she had had two such episodes of "confusion, disorientation, with whole body jerking," resulting in her being "unresponsive on the floor for a few minutes." (AR 682.) Dr. Arora noted that her symptoms were "indicative of generalized tonic-clonic seizure" and ordered a brain MRI. (AR 683.) The MRI demonstrated "no acute or subacute abnormality" and showed only "[m]ild" bilateral mastoid and ethmoid sinus mucosal thickening. (AR 681.) It found "several old periventricular and subcortical white matter [and] small vessel infarcts," which apparently was a "very common and non-specific MRI finding," though the "overall number [was] more than usually seen at [Plaintiff's] age." (Id.) In August 2015, Plaintiff reported another episode. (AR 684.) Dr. Arora noted that a "normal EEG d[id] not rule out seizure disorder" and prescribed an "antiseizure medication," Topamax. (AR 685.)

In June 2015, Plaintiff had a sleep study done, showing that at a pressure of "15.0 cwp" she had a "marked improvement of apnea and hypoxia" and that she "tolerated PAP therapy well." (AR 844-46.) Her mask was adjusted in July 2015. (AR 840.) In August 2015, Plaintiff had a bone-density test; the results were

_____

[31] It doesn't appear that an ECG was performed after Dr. Tavassoli recommended it. But her most recent ECG before that, in September 2014, was "normal." (AR 715.)

"normal." (AR 832-34.)

ii. *Consulting Opinions*

In June 2013, orthopedic surgeon Vicente R. Bernabe saw Plaintiff for a consulting exam, with mostly normal results. (See AR 565-69.) Her gait was "normal," she was "able to toe and heel walk," and she "did not use any assistive device to ambulate." (AR 566.) Her cervical spine had "no significant tenderness to palpation," and its "[r]ange of motion was full and painless." (Id.) "[I]nspection of [her] thoracic spine was unrevealing," and "[p]alpation elicited no tenderness." (AR 567.) Her lumbar spine had a "normal" lordotic curve, and "no spasm" was observed. (Id.) Though she was "tender at the thoracolumbar and lumbosacral junction," her "[s]ciatic notches and gluteal muscles were not tender." (Id.) Her shoulders had "no significant tenderness to palpation," and her elbows, wrists, hands, hips, knees, ankles, and feet had "no tenderness" at all. (AR 567-68.) She also had "full and painless" range of motion and "grossly intact" motor strength in all extremities. (Id.)

Dr. Bernabe diagnosed Plaintiff with a "[t]horacolumbar and lumbosacral musculoligamentous strain" and a "[h]istory of fibromyalgia." (AR 568.) He found that she could "lift and carry 50 pounds occasionally and 25 pounds frequently" and push and pull "without limitations." (Id.) She could walk and stand for "six hours" and sit for "six hours" in an eight-hour day. (AR 569.) She had no agility, manipulative, or postural limitations. (Id.) Dr. Bernabe did not review any of Plaintiff's medical records in forming his opinion. (AR 565.)

That same month, Plaintiff saw psychologist Colleen Daniel

for a consulting exam. (AR 572-76.) Upon examination, Plaintiff's speech was "clear" and her thoughts were "organized," though "[p]sychomotor slowing" was "evident" and her intellectual functioning was "below average." (AR 574.) Her memory was "moderately diminished for immediate, intermediate[,] and remote memories," and she had "markedly diminished" attention and concentration span. (<u>Id.</u>) She possessed "fair" insight, judgment, and fund of knowledge. (<u>Id.</u>) Dr. Daniel found that "[g]iven [Plaintiff's] test results and clinical data," her overall cognitive ability fell in the "borderline intellectual functioning range." (AR 575; <u>see also</u> AR 574-75 (results of tests conducted).) She diagnosed her with attention deficit hyperactivity disorder, generalized anxiety disorder, and dysthymic disorder. (AR 576.) She opined that Plaintiff could "understand, remember and carry out short, simplistic instructions with mild difficulty" but would have "moderate difficulty" doing so for tasks with "detailed and complex instructions." (<u>Id.</u>) She would have "no difficulty" making simplistic work-related decisions without special supervision, "mild difficulty" complying with safety- and attendance-related job rules and responding to changes in a normal workplace, and "moderate difficulty" maintaining persistence and pace in a normal workplace. (<u>Id.</u>)

In July 2013, orthopedic surgeon David Subin reviewed Plaintiff's record and assessed her functional limitations. (AR 88-89, 93.) He determined that she could "lift and/or carry" 50 pounds occasionally and 25 pounds frequently, "[s]tand and/or walk" for "6 hours in an 8-hour workday," sit for "6 hours in an

8-hour workday," and "[p]ush and/or pull" an "[u]nlimited"
amount.  (AR 89.)  She had no postural, manipulative, visual,
communicative, or environmental limitations.  (Id.)

In December 2013, internist D. Rose also assessed
Plaintiff's functional limitations.  (AR 103-05, 125.)  He found
the same exertional limitations as Dr. Subin but determined
additional postural and environmental limitations.  (See id.)
Plaintiff could "[f]requently" climb ramps and stairs, balance,
stoop, kneel, crouch, and crawl but could "[n]ever" climb
ladders, ropes, or scaffolds "due to [her] morbid obesity."  (AR
104.)  She could have "[u]nlimited" exposure to extreme cold and
heat, wetness, humidity, noise, vibration, fumes, odors, dusts,
gases, and poor ventilation but needed to "[a]void even moderate
exposure" to such hazards as "unprotected heights" and "dangerous
machinery" "due to [her] morbid obesity."  (AR 104-05.)  She also
needed to "avoid frequent walking on uneven terrain" because of
her obesity.  (AR 105.)

### iii. *Daily Activities*

In April 2013, Plaintiff's husband filled out a third-party
function report (AR 258-66) and helped her complete a function
report for herself (AR 267-75).  In his report, he wrote that she
was "unable to walk or stand for periods of time" and didn't have
"good" balance.  (AR 258.)  She took care of pets by "feed[ing]
them"; her niece helped by "bath[ing] them and tak[ing] them
outside."[32]  (AR 259.)  He wrote that she "use[d] [her] C-PAP

---

[32] In November 2013, Plaintiff reported a sore shoulder
after one of her dogs yanked its leash while she was walking it.
(AR 649.)  Plaintiff thus apparently also walked the dogs.

machine." (Id.) He helped her dress by "hook[ing] her bra for her," but she was able to "take[] showers," feed herself without problems, shave with a "special razor," and do her hair, though "sometime[s] she ha[d] trouble lifting [her] arms." (Id.) He had to remind her to take her medication, and she couldn't cook because she was "unable to stand for periods of time." (AR 260.) She went outside "daily," drove, and could go out alone. (AR 261.) She shopped "in stores" a "couple times a month" for "food and clothing." (Id.) She could count change but was "unable to read or spell words." (Id.) He wrote that she "talk[ed] to friends and family on [the] phone" "daily" but was "unable to do social activities" or walk, stand, or sit "because of [her] pain." (AR 262-63.) She could lift "maybe 5 to 10 pounds," walk "maybe 150 to 200 feet," and needed to rest "about 15 minutes" before resuming walking. (AR 263.)

The function report he helped Plaintiff complete assessed similar limitations. (See AR 267-75.) She stated that her "hands cramp[ed]" when she cooked (AR 269), she went to church regularly on Sundays (AR 271), and she didn't finish what she started (AR 272). She claimed that she "c[ouldn't] lift 10 pounds" and was "unable to walk any distance" or "pay attention for any amount of time." (Id.) Her impairment affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, and use her hands. (Id.)

Plaintiff reported to Dr. Daniel in June 2013 that she "spen[t] her time watching television and sleeping" and "need[ed] assistance with household chores, shopping[,] and ambulation."

(AR 573.) Her husband "manage[d] the money." (Id.) She "ha[d] a valid driver's license and [was] able to drive." (Id.)

In October 2013, Plaintiff's friend filled out a third-party function report (AR 284-92) and helped Plaintiff complete another function report for herself (AR 293-301). She wrote that Plaintiff was "weak and in pain constantly [and] her medications limit[ed] her drastically, [as did] her lack of concentration, depression, mobility, drive[,] and energy." (AR 284.) She stated that Plaintiff's niece and nephew did "housework, yard work, prepare[d] meals, [and] shop[ped]." (AR 285.) Plaintiff had "no problem" with personal care but needed "to be reminded or asked if she'[d] taken her med[ication]." (AR 285-86.) It took her a "couple minutes" to prepare "breakfasts." (AR 286.) She went outside "once or twice a day" and traveled by driving or riding in a car. (AR 287.) She shopped "[i]n stores" for an "hour to 2 h[ours]" "once a week" for "food and clothing" and "household supplies." (Id.) She noted that Plaintiff could "pay bills with help but checkbook balancing or writing checks [was] something she c[ouldn't] do." (Id.) She watched television "ver[y] well" and partook in "crafts, sewing, [and] art" "depend[ing] on how she[ was] feeling." (AR 288.) She had "no patience" and "d[id] not carry her groceries because of pain and weakness." (AR 289.) She could walk "a block maybe" before needing to rest for "5 to 10 min[utes]." (Id.) She could pay attention for "10" or "15" minutes before "get[ting] distracted." (Id.)

Plaintiff completed her own October 2013 function report with her friend's help. (See AR 293-301.) Plaintiff claimed

that her "ADD cause[d] [her] to have difficulty learning and remembering stuff." (AR 293.) Her fibromyalgia caused "pain in [her] body that [made] it hurt[] to stand or move around," and her sleep apnea caused fatigue. (<u>Id.</u>) She prepared such food as a "bowl of cereal, coffee, [or] bagel," but her niece prepared the "rest of [the] meals." (AR 295.) She drove a car and could go out alone. (AR 296.) When she shopped — "maybe once a week" for "an hour to 3 h[ours]" — she "use[d] carts to lean on and mobility carts" to get around the store. (<u>Id.</u>) She spent her days "watching TV and movies, craft[ing], sewing if it [was] a good day, [and] flower arranging," and she was "pretty good" at doing those activities. (AR 297.) Though she had stated in April that she went to church on Sundays (<u>see</u> AR 271), by October she apparently had stopped going and went "on a regular basis" only to doctor appointments (AR 297-98). She couldn't "keep in" things she was "told or instructed," and her "medications hamper[ed] [her] seeing and memory." (AR 298.)

At her August 7, 2015 hearing, Plaintiff testified that she "hurt from head to toe" "[a]ll day" from fibromyalgia and arthritis. (AR 41-42.) She rated the "average amount of pain" she experienced at a "seven" of 10. (AR 41.) She stated that her pain "pretty much stay[ed] the same" on Lyrica. (AR 41-42.) On an average day, she pet her dogs, watered "out in front of [her] house," did dishes, watched television, and "exercise[d]" in the pool "a couple times." (AR 42-43.) She "drop[ped] stuff all the time" because she had difficulty "keep[ing] grip." (AR 43-44.) She experienced "shaking in [her] hands" and "sometimes" in her arms and legs "[e]very day." (AR 45-46.) Her ability to

walk and drive was affected by the shaking in her legs.  (AR 46.)
She could lift a "gallon jug" but only "up the steps and that[]
[was] about it."  (AR 48.)  She alleged that she could sit for
only "10/15" minutes before needing to change position and walk
for "maybe ten minutes" before needing to spend "three or four
minutes" catching her breath.  (AR 48-49.)

     She testified that she had just "got [her CPAP machine]
straightened [out]" and it helped her "sleep a little longer
through the night," but she still got "air in [her] eyes."  (AR
49-50.)  She stated that her shoulder was "doing really good"
after surgery and therapy but that it now had "a pull to it . . .
when [she] grip[ped] something" and "it hurt[] if [she] lift[ed]
[something] heavy."  (AR 51.)  She hadn't been driving "at all"
because of her recent seizures.  (AR 53-54.)  She said that she
"ha[dn't] tried to work because [she] d[idn't] know what [she]
c[ould] do" with her limitations.  (AR 56.)

             3.  <u>Analysis</u>

     The ALJ found that Plaintiff's symptom statements were "not
entirely credible" because (1) the "objective findings . . .
fail[ed] to provide strong support for [her] allegations of
disabling symptoms and limitations" (AR 21), (2) her treatment
was "essentially conservative in nature" (AR 21, 24), (3) her
"pain was controlled on Lyrica" (AR 23), (4) she was "non-
compliant with CPAP usage" (<u>id.</u>), (5) her daily activities were
"indicative of greater functional capabilities" (AR 25), and (6)
her "marginal intermittent and part-time" work history indicated
that a "lack of interest in working" rather than her medical
conditions "account[ed] for her current lack of employment"

(id.). Plaintiff argues that the ALJ improperly rejected her "pain and symptom testimony." (J. Stip. at 5-12, 20-21.) She is correct; the ALJ materially erred in discounting her statements' credibility, and those errors were not harmless.

i. *Objective Findings*

Contradiction with evidence in the medical record is a "sufficient basis" for rejecting a claimant's subjective symptom testimony. Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008); see Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining credibility). Although a lack of medical evidence "cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in [her] credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing § 404.1529(c)(2)).

The ALJ found that the "objective findings . . . fail[ed] to provide strong support for [Plaintiff's] allegations of disabling symptoms and limitations." (AR 21.) She recognized that Plaintiff had a "history of chronic pain complaints stemming from a diagnosis of fibromyalgia," among other impairments, but found that the "objective signs and findings on physical examinations ha[d] not been particularly adverse[,] showing minimal if any neurological deficits." (Id.) She cited an abundance of "normal" and "unremarkable" physical examinations and imaging to support that reason. (See AR 21-25.) But no laboratory tests or

32

objective findings confirm the presence or severity of

fibromyalgia.  See Benecke v. Barnhart, 379 F.3d 587, 590 (9th

Cir. 2004).  Indeed, fibromyalgia manifests with an "absence of

symptoms that a lay person may ordinarily associate with joint

and muscle pain." Revels v. Berryhill, 874 F.3d 648, 656 (9th

Cir. 2017) (citing Rollins, 261 F.3d at 863 (Ferguson, J.,

dissenting)).  Fibromyalgia patients have "muscle strength,

sensory functions, and reflexes that are normal"; "[t]heir joints

appear normal, and further musculoskeletal examination indicates

no objective joint swelling."  Id. (alteration omitted).  In such

cases, "[t]he condition is diagnosed 'entirely on the basis of

the patients' reports of pain and other symptoms.'"  Id. (quoting

Benecke, 379 F.3d at 590).

Plaintiff's medical records demonstrate extensive complaints

of generalized muscle pain (see, e.g., AR 512-14 (Oct. 2009:

"pain in both her upper and lower body"), 506 (July 2010: "aching

pain" in "lower back"), 496 (May 2011: "achy sensation all

over"), 390 (June 2012: "pain all over"), 366 (Oct. 2012:

"generalized soft tissue pain"), 625 (Jan. 2013: "generalized"

"pain all over body"), 821 (May 2014: "persistent" "joint pain"

in "multiple sites")), fatigue (see, e.g., AR 508 (Nov. 2009:

noting "fatigue" "over several years"), 398 (Mar. 2012:

"[p]ositive" for fatigue), 366 (Oct. 2012: complaining of

"fatigue")), sleep problems (see, e.g., AR 525 (Feb. 2007:

"cannot sleep at nighttime due to the pain")),[33] depression (see,

---

[33] Though many of Plaintiff's fatigue- and sleep-related
complaints stemmed from obstructive sleep apnea (see, e.g., AR
414 (complaining of "generalized fatigue and myalgia, relating
the symptoms to difficulties with sleep, due to sleep apnea")),

33

e.g., AR 514 (Oct. 2009: "on Prozac" for "depression"), 821 (May 2014: "active depression" and "stress/anxiety")), and poor concentration (see, e.g., AR 361 (Mar. 2012: "[m]oderate[ly]" poor concentration), 358 (Apr. 2012: "[s]evere[ly]" poor concentration), 356 (May 2012: "[m]oderate[ly]" poor concentration)), all of which are indicative of fibromyalgia. See SSR 12-2p, 2012 WL 3104869, at *3 (July 25, 2012) (describing fibromyalgia "symptoms, signs, or co-occurring conditions" as including "manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome"); Revels, 874 F.3d at 657 (same); Benecke, 379 F.3d at 589-90 (explaining that common symptoms of fibromyalgia "include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease").

Moreover, at least four times she was recorded as having more than 11 of 18 tender points. (See AR 512 (Oct. 2009: "Patient has greater than 11 positive trigger points"), 508 (Nov. 2009: "12/18" "tender points [at] upper and lower back, chest wall, base of the neck, [and] knees"), 415 (Nov. 2011: "[m]ild diffuse soft tissue tenderness including 12/18 defined tender points"), 624 (Feb. 2013: "18/18 tender points"); cf. AR 505

---

that condition itself likely was connected to her fibromyalgia. See Sleep Apnea in Patients with Fibromyalgia, Practical Pain Mgmt., https://www.practicalpainmanagement.com/pain/ myofascial/fibromyalgia/sleep-apnea-patients-fibromyalgia-growing-concern (last updated Sept. 20, 2011) ("Patients with fibromyalgia have a tenfold increase in sleep-disordered breathing, including obstructive sleep apnea.").

(Oct. 2010: "6/18" "tender points in the upper and lower back and chest wall").) "[T]ender-point examinations themselves constitute 'objective medical evidence' of fibromyalgia." Revels, 874 F.3d at 663 (quoting SSR 12-2p, 2012 WL 3104869, at *2-3) (noting that plaintiff's showing of 11 or more tender points at "five out of eight appointments" met "cutoff for a diagnosis of fibromyalgia under SSR 12-2P's first set of criteria").

Defendant argues that "Plaintiff presents no doctor[']s opinion that suggests [she] has restrictions anywhere close to her allegations," citing the less-restrictive opinions of Drs. Bernabe, Subin, and Rose. (J. Stip. at 18.) But Dr. Bernabe reviewed "no medical records" in making his orthopedic assessment of Plaintiff's disability. (AR 565.) SSR 12-2p provides, and the 9th Circuit has recognized, that an "analysis of [a fibromyalgia patient's] RFC should consider 'a longitudinal record whenever possible'" because "the symptoms of fibromyalgia 'wax and wane.'" Revels, 874 F.3d at 657 (quoting SSR 12-2p, 2012 WL 3104869, at *6). The opinions of the state-agency consultants, Drs. Subin and Rose, suffer from the same "fundamental misunderstanding of fibromyalgia" as the ALJ's decision. See id. at 662. Both doctors found Plaintiff "[p]artially [c]redible" because her "allegations of severity [were] not fully supported by objective findings" (AR 88 (Dr. Subin), 102 (Dr. Rose)), and in so doing failed to "construe[] [the medical evidence] in light of fibromyalgia's unique symptoms and diagnostic methods." Revels, 874 F.3d at 662.

Thus, the lack of abnormal objective findings on examination

was not a sufficient basis to discount Plaintiff's subjective symptom statements. Id. at 666; Hamilton-Carneal v. Colvin, 670 F. App'x 613, 614 (9th Cir. 2016); Payan v. Colvin, 672 F. App'x 732, 732 (9th Cir. 2016).

ii. *Conservative Treatment*

The ALJ found that Plaintiff's "overall treatment ha[d] been essentially conservative in nature and [was] not comm[ensurate] with the alleged severity of her overall conditions." (AR 21.) Conservative treatment is a legitimate reason for an ALJ to discredit a claimant's testimony regarding the severity of an impairment. Parra, 481 F.3d at 751. But "[a]ny evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated," Revels, 874 F.3d at 667, and a claimant "cannot be discredited for failing to pursue non-conservative treatment options where none exist," Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010). "Fibromyalgia is treated with medications and self-care," McNeal v. Berryhill, No. EDCV 17-0993 SS, 2018 WL 2078810, at *7 (C.D. Cal. May 2, 2018), rather than "surgery or other more radical options," Sharpe v. Colvin, No. CV 13-01557 SS, 2013 WL 6483069, at *8 (C.D. Cal. Dec. 10, 2013).

Plaintiff was prescribed myriad medications for her impairments, including amitriptyline, Prozac, Zantac, temazepam, Lyrica, Neurontin, Cymbalta, Tagamet, Vicodin, Robaxin, Celexa, Naprosyn, nortriptyline, Topamax, Zoloft, tramadol, Butrans patches, meloxicam, and Flexeril, to treat her pain, depression, anxiety, insomnia, and other symptoms related to fibromylagia. (See AR 348-49, 351, 367, 391, 415, 502-03, 507-10, 512, 514-16,

518-19, 521-22, 524-25, 532, 535, 685, 822.) Her doctors had
increased her Lyrica prescription to a more aggressive dosage,
but they had to decrease it again after she experienced liver
problems. (See AR 516 (May 2008: "we need to keep upping her
Lyrica as her pain keep[s] on worsening"), 508-09 (Nov. 2009:
Lyrica dose of 700 mg decreased "gradually" to 450 mg because
liver enzymes "elevated"), 57-58 (Aug. 2015: Plaintiff testifying
that her doctors increased her Lyrica prescription but it caused
"a problem with [her] liver").) Her doctors regularly
supplemented Lyrica with narcotics, such as Vicodin, tramadol,
and Butrans patches, to further manage her pain. Though at times
she tried to "minimiz[e]" her use of narcotics because they were
"sleep-inducing" or "too strong" (see AR 390, 421, 497), her
longitudinal use of them was fairly regular (see AR 58, 353, 366-
67, 390-91, 399, 407, 494, 496, 502-03, 506, 508, 510, 512, 514,
516-18, 560, 566, 625, 643). See SSR 12-2p, 2012 WL 3104869, at
*6 (Commissioner should "consider a longitudinal record whenever
possible because the symptoms of [fibromyalgia] can wax and
wane"). She also received a ketorolac injection in August 2011.
(AR 431.) The use of narcotics to control pain in conjunction
with injections likely does not constitute "conservative"
treatment. See, e.g., Ruiz v. Berryhill, No. CV 16-2580-SP, 2017
WL 4570811, at *5-6 (C.D. Cal. Oct. 11, 2017) (treatment by
"narcotic medication, facet joint injections, and epidural
steroid injections" not conservative). Moreover, "[t]he ALJ
provided no explanation why [s]he deemed this treatment
'conservative' for fibromyalgia." Revels, 874 F.3d at 667; see
Sharpe, 2013 WL 6483069, at *8 (fibromyalgia treatment not

conservative when plaintiff was "consistently and heavily medicated" and "referred to fibromyalgia specialists"); <u>Matamoros v. Colvin</u>, No. CV 13-3964-CW, 2014 WL 1682062, at *4 (C.D. Cal. Apr. 28, 2014) (fibromyalgia treatment consisting of "trigger point injections and a variety of medications" not conservative).

To the extent her mental impairments can be distinguished from her physical fibromyalgia-related symptoms, the ALJ may have properly discounted those symptoms based on "conservative treatment consisting mainly of medication management through her primary care physician." (<u>See</u> AR 24.) Plaintiff did not "pursue regular mental health care treatment," seeing Dr. Offenstein, a psychologist, or his nurse practitioner only from March to July 2012, to treat her grief after her father-in-law passed away. (AR 347-55, 356-58, 361-63); <u>see</u> <u>Matin v. Comm'r of Soc. Sec. Admin.</u>, 478 F. App'x 377, 379 (9th Cir. 2012). As noted by the ALJ, "the record includes no hospitalization or extensive psychotherapy treatment." (AR 24.) Rather, she managed her depression and anxiety through medications prescribed by her primary-care doctors at Riverside Medical Clinic. Such mental-health treatment likely was conservative. <u>But see</u> <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1464-65 (9th Cir. 1996) (claimant's failure to seek any psychiatric treatment for over three years not legitimate basis for discounting medical opinion).

But Plaintiff's overall treatment was likely not conservative, and thus that was not a clear and convincing reason to discount her statements' credibility. <u>See</u> <u>Revels</u>, 874 F.3d at 667.

### iii. *Pain Controlled On Lyrica*

The ALJ found that Plaintiff "reported that her pain was controlled on Lyrica." (AR 23 (citing only AR 633); <u>see also</u> AR 25.) "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." <u>Warre v. Comm'r of Soc. Sec. Admin.</u>, 439 F.3d 1001, 1006 (9th Cir. 2006). But the "symptoms of fibromyalgia 'wax and wane,'" and "a person may have 'bad days and good days.'" <u>Revels</u>, 874 F.3d at 657 (quoting SSR 12-2p, 2012 WL 3104869, at *6).

Though at times Lyrica helped manage Plaintiff's pain (<u>see, e.g.</u>, AR 506 (July 2010: Lyrica "has been helpful"), 505 (Oct. 2010: Plaintiff "feel[s] relatively well" on Lyrica), 497 (Apr. 2011: pain "relatively controlled on [L]yrica and naproxen"), 414 (Nov. 2011: "Lyrica remains effective"), 633 (Feb. 2015: "pain controlled with Lyrica")), in fact, the medication's effectiveness fluctuated (<u>see, e.g.</u>, AR 508 (Nov. 2009: "[t]rial of multiple medications with inadequate control of pain"), 366 (Oct. 2012: "[c]urrent medications[] inadequate in controlling intensity of pain")), and Plaintiff often turned to narcotics to obtain further relief (<u>see, e.g.</u>, AR 496 (May 2011: "Takes Vicodin . . . once a day"), 391 (June 2012: tramadol "for pain"), 366-67 (Oct. 2012: using Vicodin "twice or sometimes three times a day," so discontinued and "Butrans patch" prescribed instead)). Moreover, Plaintiff testified that though Lyrica "work[ed]," it wasn't "enough to stop the pain." (AR 57; <u>see also</u> AR 496 (May 2011: feeling "achy sensation all over" despite being "slightly better since on Lyrica," and taking Vicodin "once a day").) An

ALJ "should consider 'a longitudinal record whenever possible.'"
Revels, 874 F.3d at 657 (quoting SSR 12-2p, 2012 WL 3104869, at
*6).  The ALJ here was provided with eight years of medical
records; focusing on Lyrica's effectiveness at only one point in
time was error.  Ghanim v. Colvin, 763 F.3d 1154, 1160 (9th Cir.
2014) (reviewing court "may not affirm simply by isolating a
specific quantum of supporting evidence" (citations omitted)).

iv.  <em>Noncompliance With C-PAP Machine</em>

The ALJ further found that Plaintiff was "consistently noted
throughout the treatment record to have been non-compliant with
CPAP usage."  (AR 23.)  An ALJ may discount a claimant's symptom
testimony based on a "lack of consistent treatment."  Burch, 400
F.3d at 681.  But "no adverse credibility finding is warranted
where a claimant has a good reason for failing to obtain
treatment."  Lapeirre-Gutt, 382 F. App'x at 664 (citing Orn v.
Astrue, 495 F.3d 625, 638 (9th Cir. 2007)).

Plaintiff contends that her noncompliance was because of an
"inability to afford the machine."  (J. Stip. at 10.)  She also
explains that she had "problems with the fit of her mask."  (Id.
at 9-10.)  Plaintiff was diagnosed with sleep apnea in June 2007
(AR 457), and in August it was noted that she "could not tolerate
[the] standard CPAP mask" (AR 471).  A new mask was immediately
ordered for her.  (AR 473.)  In November 2007, she stated that
she "could not afford to rent the CPAP machine on a monthly
basis" and "ha[d] stopped using [the] machine due to [that] cost
issue."  (AR 518.)  Two years later, in October 2009, she was
"not using her nasal CPAP" and was referred "back to pulmonary."
(AR 514.)  Three weeks later, she was still not "using her nasal

40

CPAP" but had "an appointment with pulmonary next week." (AR 512.) At that appointment, in November 2009, a pulmonologist noted that her machine had "too much pressure," and he recommended several adjustments. (AR 557-58.)

In June 2012, she still "ha[d] not used CPAP due to frustration with the fit" and "ha[d] not seen pulmonology to discuss fitting or titration for several years." (AR 391.) In August 2012, she was reevaluated for sleep apnea (AR 382) and another mask was ordered (AR 461-62). In October 2012, however, she still "struggle[d] with each mask" (AR 376), and a "new order" was placed (AR 463-65). In February 2013, she was using the CPAP mask "inconsistent[ly]" (AR 624) and hadn't gotten it "adjusted" by June 2013 (AR 617). She underwent a sleep study in March 2014 to calibrate her mask (AR 656-57), and in May 2014 she was "instructed to use [her] C-PAP machine on a regular basis" (AR 822, 825, 827). In September 2014, she was advised to "continue" her CPAP usage (AR 638), implying that she had been using it. She completed another sleep study in June 2015 (AR 844-46); her mask was "[a]djusted" in July (AR 840), and follow-up "goals" included "ensur[ing] CPAP treatment compliance" (AR 841). Plaintiff testified in August 2015 that she had "just went and got [her CPAP mask] straighted up" and that it helped her "sleep a little longer through the night." (AR 49.)

Failure to seek treatment because of a "lack of funds" is a valid reason for limited treatment. Orn, 495 F.3d at 638 (holding that benefits cannot be denied when plaintiff's failure to obtain treatment arises from lack of medical insurance (citing Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995))); see Smolen,

41

80 F.3d at 1284 (Plaintiff "had not sought treatment" because "she had no insurance and could not afford treatment"). As described above, Plaintiff seemingly stopped using the CPAP machine in late 2007 because she could not afford it. Although that 2007 treatment note is the only record of cost issues in relation to her CPAP machine, money problems appear elsewhere in the record, including times when she held off on or canceled other treatment for financial reasons.

In May 2008, she reported "financial stress [because] her husband [was] working less hours." (AR 516.) In December 2009, her doctor recorded that they would "hold off on egd/colonoscopy for now given [Plaintiff's] financial situation." (AR 533.) At an appointment in November 2011, she asked that certain "paperwork [be] filled out to help with the cost of [her] med[ication]." (AR 414.) In March 2012, Plaintiff reported to Dr. Offenstein that she had "constant" "financial worry" (AR 361), told his nurse practitioner that she was "unstable financially" (AR 353), and canceled an appointment because she had "no money" for it (AR 359). And in May 2012, she reported being worried about making her "house payment" and paying "bills." (AR 357.) The ALJ recognized Plaintiff's apparent financial difficulties only in summarizing her mental-health treatment (AR 24 (describing "constant financial worry" Plaintiff reported to her psychologist)) but not in the context of her ability to afford her CPAP machine (see AR 23-24).

It is unclear whether Plaintiff's inability to afford the CPAP machine or her frustration with the myriad adjustments accounts for the extended periods when she didn't follow through

on obtaining appropriately fitted masks.  Likely it was a combination of the two.  To the extent her financial instability explained her noncompliance, the ALJ was wrong to discount the credibility of her symptom statements on that basis.  <u>See</u> <u>Lapeirre-Gutt</u>, 382 F. App'x at 664; <u>Orn</u>, 495 F.3d at 638; <u>Smolen</u>, 80 F.3d at 1284.  Although Plaintiff's ability to seek and receive other care during the relevant period suggests that perhaps she could afford the machine at least at times, <u>see</u> <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1464 (9th Cir. 1995) (affirming ALJ's discounting of plaintiff's "claim that lack of money prevented her from seeking help for ongoing problems" "because she sought appropriate medical care . . . for other medical symptoms . . . during the intervening years"), the ALJ failed to recognize that financial problems may have impacted Plaintiff's "non-complian[ce]" (<u>see</u> AR 23-24).  Thus, the noncompliance likely was not a sufficient reason to discount Plaintiff's symptom statements.[34]

> v.   *Daily Activities*

The ALJ further discounted Plaintiff's pain and symptom testimony because her daily activities were "indicative of greater functional capabilities." (AR 25.)  He noted that she "testified to watering in front of her house, washing dishes, swimming a couple of times at the local pool, and shopping."

---

[34] The ALJ also did not explain how noncompliance with her CPAP machine, used only for treating sleep apnea, demonstrated that her subjective fibromyalgia-related pain testimony was not credible.  <u>See</u> <u>Cagle v. Colvin</u>, No. 1:15-cv-00852-SKO, 2016 WL 3912950, at *9 (E.D. Cal. July 20, 2016) (finding that plaintiff's "failure to use his CPAP mask" was not "proper basis" for rejecting pain testimony "without further explanation").

(Id.) He also found that she "reportedly cared for her father in law prior to his passing" and had "recently" been exercising and "reportedly walking three miles per day." (Id.) An ALJ may properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with her daily activities. See Molina, 674 F.3d at 1113. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. But the "mere fact that a plaintiff has carried on certain daily activities does not in any way detract from her credibility as to her overall disability." Revels, 874 F.3d at 667 (alteration omitted) (citing Benecke, 379 F.3d at 594). Impairments that would "unquestionably preclude work . . . will often be consistent with doing more than merely resting in bed all day." Kelly v. Berryhill, __ F. App'x __, No. 16-17173, 2018 WL 2022575, at *3 (9th Cir. May 1, 2018) (citing Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014)).

Plaintiff's ability to "water out in front of [her] house" using a "lightweight" hose (AR 42), wash dishes "if [she's] not dropping them (AR 43), swim "a couple times" in her local pool (id.), and "go to the grocery store" while "hold[ing] on to the shop[ping] cart" (AR 48) was not inconsistent with her claims that it "hurt[] to stand or move around" (AR 293, 298), she couldn't "stand for more than 15 minutes" (AR 267), her "hands cramp[ed]" (AR 267, 269), and she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, seeing, remembering, completing tasks,

concentrating, understanding, following instructions, and using her hands (AR 272, 298).  See Revels, 874 F.3d at 667-68 (plaintiff's daily activities of "using the bathroom, brushing her teeth, washing her face, taking her children to school, washing dishes, doing laundry, sweeping, mopping, vacuuming, going to a doctor's appointment for her or for one of her children, visiting her mother and father, cooking, shopping, getting gas, and feeding her dogs" didn't "detract from her credibility" when she could "complete only some of the tasks in a single day and regularly needed to take breaks"); Popa v. Berryhill, 872 F.3d 901, 907 (9th Cir. 2017) (as amended) ("attending church and shopping for groceries" not inconsistent with plaintiff's moderate limitations); Blau v. Astrue, 263 F. App'x 635, 637 (9th Cir. 2008) ("[d]aily household chores and grocery shopping" not "easily transferable to a work environment").

The ALJ also noted that Plaintiff "reportedly cared for her father in law prior to his passing."  (AR 25.)  But that "finding, standing alone, [was] not a sufficient basis to question [her] testimony regarding the extent of her pain" because the record does not "indicate that she performed [that] work on any kind of regular or sustained basis."  See Lapeirre-Gutt, 382 F. App'x at 664-65.

The ALJ further found that in late 2014, Plaintiff was walking "three miles per day" (AR 25 (citing AR 635)), which directly contradicted her allegations that she was "unable to walk any distance" (AR 272) and couldn't "stand for but a few minutes" (AR 298).  Though walking that distance apparently

caused "foot pain" and "shin splints" (AR 635 (Dec. 2014), 676 (Jan. 2015)), she subsequently sought "orthotics for walking shoes" (AR 676 (Jan. 2015)), which then helped "improv[e] some of [her] painful symptoms" (AR 670 (Apr. 2015)). It is unclear whether she continued to walk three miles a day after being fitted for orthotics, but the record suggests she was actively "exercising/walking more" at that point (AR 669; see also AR 390 (reporting "some pain with extensive workouts" in 2012)).

Thus, the ALJ's finding that Plaintiff's walking "three miles per day" was "indicative of greater functional capabilities" than she testified to may have been a sufficient reason to discount the credibility of her statements. (AR 25); see Molina, 674 F.3d at 1113. But as explained below, remand is warranted because the ALJ's errors discussed above were not harmless.

### vi. *Work History*

Finally, the ALJ found that Plaintiff's work history "reflect[ed] a pattern of marginal[,] intermittent[,] and part-time work, indicating that her impairments may not [have been] the sole reason for her . . . inability to sustain full-time competitive employment." (AR 25 (citing AR 244).) Plaintiff argues that the ALJ made that "speculation without any inquiry into [her] life circumstances, for instance, if [she] spent [that] time raising a child or taking care of a home." (J. Stip. at 11.)

An ALJ may consider work history when evaluating a claimant's credibility. See Thomas, 278 F.3d at 958-59. And the fact that a claimant had "spotty" or "sporadic" work history

46

before filing for disability may constitute a clear and
convincing reason for discounting the credibility of her
subjective statements.  Id. at 959; Sherman v. Colvin, 582 F.
App'x 745, 747-48 (9th Cir. 2014).  Indeed, Plaintiff's work
history was "spotty, at best."  See Thomas, 278 F.3d at 959.  She
testified that "in the last 15 years" she had had "only" "two
jobs."  (AR 38.)  She sold cooking products with her niece but
"wasn't with it that long," never making "more than a thousand
[dollars] in . . . a month."  (AR 38-39.)  For a period of time,
she also worked in a portrait studio "full-time" and "sometimes a
little more on holidays" but stopped working in June 2006 because
her employer wouldn't "give [her] time off" to be with her
grandkids after they were seriously injured.  (AR 39-41, 252.)
Her earnings summary shows that before 1994, she made less than
$3000 a year; between 1994 and 2001, she had no earnings at all;
and between 2002 and her alleged onset date in 2006, her income
varied remarkably.  (See AR 244.)  In her disability report, she
claimed that between January 2002 and June 2006, she worked the
portrait-studio job eight hours a day for five days a week,
making $9.50 an hour.  (AR 252.)  If that were true, she should
show earnings of around $19,000 each of those years.  But she
made over $15,000 during only two of those years, suggesting that
she was not in fact working full-time for a substantial portion
of that time.  (See AR 244.)

Moreover, Plaintiff apparently left that job not because she
had a "lack of interest in working" (AR 25) but rather because
her "grandkids got burned in a fire" and she thought it was
"important" to "be with [them]" (AR 40-41).  She also seemed to

47

have difficulty reading, writing, and doing math (AR 39, 54-55, 261, 263, 267, 270, 272, 287, 289, 296, 298), which could explain her "sporadic work history" (see AR 25). Indeed, Plaintiff told one of her doctors in 2012 that she wanted a job but that "nobody would hire her" because she couldn't "read, write, [or] spell." (AR 358.) Thus, although the ALJ's observation that a "lack of interest in working[] unrelated to any medical condition[] may account for her current lack of employment" may have been a reasonable inference (see AR 25); Thomas, 278 F.3d at 959, there were apparently other reasons for her intermittent work history.

Nonetheless, though two of the ALJ's reasons for discounting Plaintiff's subjective symptom testimony — her daily activities and "sporadic" work history (AR 25) — may have been valid, the Court cannot conclude that her errors in discounting those statements' credibility because of a lack of objective findings, her supposedly conservative treatment, Lyrica's alleged effectiveness, and her CPAP noncompliance were harmless. See Hamilton-Carneal, 670 F. App'x at 614 (holding that error in ALJ's discounting of claimant's fibromyalgia-related "subjective complaints" was not harmless despite her providing other legitimate reasons because "the ALJ's decision indicate[d] that the absence of 'objective medical evidence' was a central factor in her determination"). Thus, remand is warranted.

B.    Remand for Further Proceedings Is Appropriate

When an ALJ errs, as here, the Court "ordinarily must remand for further proceedings." Leon v. Berryhill, 880 F.3d 1041, 1045 (9th Cir. 2017) (as amended Jan. 25, 2018); see also Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended);

Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003). The Court has discretion to do so or to make a direct award of benefits under the "credit-as-true" rule. Leon, 880 F.3d at 1045. "[A] direct award of benefits was intended as a rare and prophylactic exception to the ordinary remand rule[.]" Id. The "decision of whether to remand for further proceedings turns upon the likely utility of such proceedings," Harman, 211 F.3d at 1179, and "[w]here . . . an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency," Leon, 880 F.3d at 1045 (second alteration in original) (citing Treichler, 775 F.3d at 1105); see also Garrison v. Colvin, 759 F.3d 995, 1021 (9th Cir. 2014).

Here, further administrative proceedings would serve the useful purpose of allowing the ALJ to "evaluate the record in light of the unique characteristics of fibromyalgia," see Revels, 874 F.3d at 667 n.6, and to resolve some of the inconsistencies in the record, including Plaintiff's work history, daily activities, and CPAP noncompliance, see Garrison, 759 F.3d at 1021 (recognizing flexibility to remand for further proceedings when "record as a whole creates serious doubt as to whether the claimant is, in fact, disabled"). If the ALJ again discounts Plaintiff's subjective symptoms, she can then provide an adequate discussion of the evidence justifying her doing so. See Payan, 672 F. App'x at 733. Therefore, remand for further proceedings is appropriate. See Garrison, 759 F.3d at 1020 n.26.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[35] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this memorandum decision.


DATED: July 25, 2018

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[35] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."